❑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 25-922M(NJ) |
| Information including information about the location of the cellular telephones assigned call numbers: (414) 248-7180, (414) 467-4928 , AND (414) 350-0829 that are in the custody or control of AT&T, as further described in Attachment A-1 | ) |
| | )          MATTER NO. 2023R00322 |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1

**YOU ARE COMMANDED** to execute this warrant on or before    6/6/2025 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for   30   days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:      5/23/2025 @12:50 p.m. _____          *Nancy Joseph* _____
                                                                                                                        *Judge's signature*

City and state:      Milwaukee, Wisconsin _____          Nancy Joseph, U.S. Magistrate Judge _____
                                                                                                                        *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A-1

## Property to Be Searched

1.    Records and information associated with the cellular devices assigned call numbers **(414) 248-7180 (TARGET TELEPHONE B), (414) 467-4928 (TARGET TELEPHONE E), and (414) 350-0829 (TARGET TELEPHONE I),** (referred to herein and in Attachment B-1 as "the **TARGET TELEPHONES**"), that is in the custody or control of AT&T Corporation, a wireless telephone provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida. There is no listed subscriber for **TARGET TELEPHONE B**, and it is used by Freddie ROBERTSON. There is no listed subscriber for **TARGET TELEPHONE E**, and it is used by Ngadah KAMANDA. There is no listed subscriber for **TARGET TELEPHONE I**, and it is used by Frank AYALA DEJESUS.

2.    The **TARGET TELEPHONES (TARGET TELEPHONE B, TARGET TELEPHONE E, and TARGET TELEPHONE I)**.

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1:

a.    The following subscriber and historical information about the customers or subscribers associated with the TARGET TELEPHONES for the time period September 1, 2023, to the present:

    i.    Names (including subscriber names, usernames, and screen names);

    ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.    Local and long-distance telephone connection records;

    iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.    Length of service (including start date) and types of service utilized;

    vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

    viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records, and

2

    ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET TELEPHONES for the time period January 1, 2024, to the present including:

        a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the TARGET TELEPHONES for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET TELEPHONES will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the TARGET TELEPHONES.

c. Information about the location of the TARGET TELEPHONES for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, NELOS, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service

3

Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the TARGET TELEPHONES on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846, involving the TARGET SUBJECTS and others known and unknown during the period from September 1, 2023 – Present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT <u>TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Corporation, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T Corporation. The attached records consist of _____.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T and they were made AT&T as a regular practice; and

b. Such records were generated by AT&T Corporation's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T Corporation in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by AT&T Corporation and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                          Signature

5

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information including information about the location of the cellular telephones<br>assigned call numbers: (414) 248-7180, (414) 467-4928 , AND<br>(414) 350-0829 that are in the custody or control of AT&T, as further described in<br>Attachment A-1 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **25-922M(NJ)**<br>       MATTER NO. 2023R00322 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), 843(b) and 846 | Distribution of and possession with intent to distribute controlled substances, use of a communication facility in furtherance of drug trafficking and conspiracy to distribute and possess with intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TIMOTHY FILTER (Affiliate)   Digitally signed by TIMOTHY FILTER (Affiliate)
Date: 2025.05.22 10:02:28 -05'00'

*Applicant's signature*

Timothy Filter, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone *(specify reliable electronic means)*.

Date: 5/23/2025

*Judge's signature*

City and state: Milwaukee, Wisconsin      Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Tim Filter, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned the following call numbers:

    a.   **(414) 737-1183, (TARGET TELEPHONE A or TT-A)** known to be used by Claudell SIMS, whose service provider is T-Mobile, a wireless telephone service provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany, New Jersey.

    b.   **(414) 248-7180, (TARGET TELEPHONE B or TT-B)** known to be used by Freddie ROBERTSON, whose service provider is AT&T Corporation, a wireless telephone provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

    c.   **(262) 887-9040, (TARGET TELEPHONE C or TT-C)** known to be used by William THOMAS, whose service provider is T-Mobile, a wireless telephone provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany, New Jersey.

    d.   **(262) 395-5337, (TARGET TELEPHONE D or TT-D)** known to be used by Antonio GREEN, whose service provider is Verizon, a wireless telephone provider ("Service Provider") headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

e. **(414) 467-4928, (TARGET TELEPHONE E or TT-E)** known to be used by Ngadah KAMANDA, whose service provider is AT&T Corporation, a wireless telephone provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

f. **(414) 610-1305, (TARGET TELEPHONE F or TT-F)** known to be used by Alonzo KIMBLE, whose service provider is US Cellular, a wireless telephone provider ("Service Provider") headquartered at 8410 W. Bryn Mawr Ave, Suite 800, Chicago, Illinois.

g. **(414) 581-0916, (TARGET TELEPHONE G or TT-G)** known to be used by Dennis BROWN, whose service provider is US Cellular, a wireless telephone provider ("Service Provider") headquartered at 8410 W. Bryn Mawr Ave, Suite 800, Chicago, Illinois.

h. **(414) 982-8254, (TARGET TELEPHONE H or TT-H)** known to be used by Alfonzo TREADWELL, whose service provider is T-Mobile, a wireless telephone provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany, New Jersey.

i. **(414) 350-0829, (TARGET TELEPHONE I or TT-I)** known to be used by Frank AYALA-DEJESUS, whose service provider is AT&T Corporation, a wireless telephone provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2. **TARGET TELEPHONE A, TARGET TELEPHONE B, TARGET TELEPHONE C, TARGET TELEPHONE D, TARGET TELEPHONE E, TARGET TELEPHONE F, TARGET TELEPHONE G, TARGET TELEPHONE H,** and **TARGET**

2

**TELEPHONE I,** are collectively referred to in this affidavit as the **"TARGET TELEPHONES."**

3. The **TARGET TELEPHONES** are described herein and in Attachments A1, A2, A3, and A4, and the location information to be seized is described herein and in Attachments B1, B2, B3, and B4.

|   | Name | Phone Number | Target Telephone |
|---|------|--------------|------------------|
| **A** | Claudell SIMS | (414) 737-1183 | Target Telephone A |
| **B** | Freddie ROBERTSON | (414) 248-7180 | Target Telephone B |
| **C** | William THOMAS | (262) 887-9040 | Target Telephone C |
| **D** | Antonio GREEN | (262) 395-5337 | Target Telephone D |
| **E** | Ngadah KAMANDA | (414) 467-4928 | Target Telephone E |
| **F** | Alonzo KIMBLE | (414) 610-1305 | Target Telephone F |
| **G** | Dennis BROWN | (414) 581-0916 | Target Telephone G |
| **H** | Alfonzo TREADWELL | (414) 982-8254 | Target Telephone H |
| **I** | Frank AYALA-DEJESUS | (414) 350-0829 | Target Telephone I |

4. Because these warrants seek the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrants are designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrants therefore include all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

5. I am a Detective with the City of Waukesha Police Department and have been a sworn law enforcement officer for over 10 years. I am currently assigned to Milwaukee's North

3

Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force as a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA). HIDTA is composed of law enforcement officers from the Milwaukee Police Department (MPD), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and several other federal and local law enforcement agencies. Since November 2022, I have been a Task Force Officer with the United States Department of Justice, DEA. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity.

6.      As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar

4

with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

7.      This affidavit is based upon my personal knowledge, training, experience, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

8.      Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility if furtherance of drug trafficking), and 846 (conspiracy to distribute and to possess with intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Timothy BEA, Claudell SIMS, Freddie ROBERTSON, William THOMAS, Antonio GREEN, Ngadah KAMANDA, Alonzo KIMBLE, Dennis BROWN, Alfonzo TREADWELL, and Frank AYALA-DEJESUS, (herein referred to as TARGET SUBJECTS) and others known and unknown. There is also probable cause to believe that the location information described in Attachments B1, B2, B3, and B4 will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

5

10.     The court has jurisdiction to issue the proposed warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.     In August 2023, North Central HIDTA initiated a drug investigation involving the trafficking of cocaine and fentanyl from the area of Burbank, Illinois to Milwaukee, Wisconsin via vehicle transportation.  The investigation reflects that Foad ISA (FOAD) (xx/xx/1965) and Hammad ISA (HAMMAD) (xx/xx/1995) bring controlled substances from Illinois to Timothy BEA (BEA) (xx/xx/1984), usually to Bar 1000 in Milwaukee, Wisconsin, and the ISAs then transport bulk currency back to Illinois. BEA then distributes the controlled substances to the TARGET SUBJECTS in the Milwaukee, Wisconsin area.

12.     The investigation to date has included traditional law enforcement methods, including but not limited to information from other law enforcement officers; documentary evidence; telephone toll data; physical and electronic surveillance, search warrants, and court-authorized Title III intercepts over six telephone lines.

a.  **Historical Background of the Drug Trafficking Organization (DTO)**

**Bar 1000 Operations and Surveillance**

13.     During surveillance operations between approximately mid-September up to the present time, case agents have observed BEA on a regular basis at Bar 1000. Case agents located a Facebook page for BEA (https://www.facebook.com/tim.bea.96).  On this Facebook page, BEA lists that he lives in Milwaukee, Wisconsin and is from Bellwood, Illinois. Additionally, BEA has multiple posts marketing Bar 1000, further showing his involvement/ownership of the bar. Through surveillance of Bar 1000, case agents observed that there are multiple exterior

6

surveillance cameras that cover every side the bar. Based on training and experience, case agents know that surveillance cameras are often used by narcotics dealers to conduct counter surveillance on any law enforcement activity and to prevent robberies by rival narcotic dealers.

14.    Based on physical and electronic surveillance, phone record data, and court-authorized location data, case agents believe that BEA continues to engage in narcotics trafficking and that he uses Bar 1000 to facilitate the DTO. Furthermore, the evidence also leads case agents to believe that other DTO members, to include the TARGET SUBJECTS, meet BEA at Bar 1000 to further their narcotics trafficking, as more specifically detailed below.

15.    On Tuesday, September 19, 2023, case agents monitored electronic surveillance at Bar 1000. At approximately 3:50 p.m., a gold Cadillac bearing Wisconsin registration ABU-1610 listing to Crystal L ROBINSON (xx/xx/1983) pulled into a parking stall in the back of Bar 1000. BEA exited the driver's seat of the vehicle and walked to the side of Bar 1000, out of view of investigators. At approximately 3:51 p.m., BEA walked to the back gate of Bar 1000, opened the back gate door leading to the bar and walked inside the patio area of the bar. Seconds later, BEA walked back out to the gold Cadillac, appeared to grab something from the vehicle, and proceeded back to the bar through the gate.   The parking slab associated with the back of Bar 1000 abuts a wooden fence, which surrounds an outdoor patio area. The wooden fence has a gated door that contains a locking mechanism. Access to the interior of Bar 1000 can be made through the back patio gate door to the back entry interior doorway.

16.    At approximately 3:52 p.m., a gray Lexus RC350 bearing Illinois registration Q198950 listing to Foad ISA at 8509 S. Natoma, Burbank, Illinois, pulled into a parking stall next to the gold Cadillac. A younger aged male, wearing a blue long sleeve shirt and blue jeans, later identified as Hammad ISA, exited the vehicle and entered the back gate door of Bar 1000.

Hammad ISA has been identified as the son of Foad ISA. At approximately 3:58 p.m., ISA came back out to the gray Lexus and got into the driver's seat of the vehicle.

17.     At approximately 4:02 p.m., BEA exited the back gate door of Bar 1000 carrying a red paper bag and walked to the side of Bar 1000, out of investigators' view. Approximately one minute later, BEA walked to the back area of the bar, no longer carrying the red bag, however now carrying a blue duffle-style bag. BEA proceeded to walk back through the back gate door carrying the blue duffle-style bag. Immediately after BEA walked into the back of Bar 1000, ISA exited the gray Lexus and followed BEA into the bar.

18.     At approximately 4:40 p.m., ISA came out from the back gate door of Bar 1000 carrying a large blue box with two hands. The box appeared heavy and appeared to contain contents inside. ISA walked to the front area of his gray Lexus and opened the hood of the vehicle, while BEA peered his head outside of the back gate door and looked around. BEA closed the back gate door while ISA was still at the front of the vehicle with the hood open. Approximately one minute later, ISA closed the hood of the vehicle and proceeded to walk to the driver's door carrying the blue box (that now appeared to be empty) with one hand. ISA sat down in the vehicle and before closing his car door he threw the blue box away in front of his vehicle with one hand, further leading agents to believe that the box no longer contained any contents. ISA proceeded to back out and drive the vehicle away. At approximately 4:47 p.m., BEA exited the back gate door and got into the gold Cadillac before driving away.

19.     Case agents observed Hammad ISA had been an identified target in multiple DEA investigations as a money courier/money launderer. In April 2021, ISA was identified in an undercover agent money pick-up investigation. ISA was identified as the money courier who dropped a large amount of United States currency to an undercover agent. During this incident, ISA was driving a gold-colored 2-door Lexus bearing Illinois registration Q198950

8

(same vehicle and registration ISA was observed operating at Bar 1000). Additionally, ISA was identified in a HSI money pick-up investigation. In April 2021, a HSI undercover agent was in contact with a Mexican money broker regarding a money contract. The undercover agent met with ISA who provided the U.S. currency to the undercover agent. In this incident, again, ISA was observed driving the same 2-door Lexus bearing IL registration Q198950.

20. Based on Hammad ISA's money laundering activities, BEA's known large-scale narcotics distribution, and the previous detailed events at Bar 1000, case agents believe that Hammad ISA picked up drug proceeds at Bar 1000 on September 19, 2023. Case agents confirmed the model of Lexus (RC350) does indeed have an engine block in the front of the vehicle underneath the hood. The engine block area of this specific model of vehicle obtains natural voids that items such as currency or narcotics could be stored in. Additionally, based on case agents' training and experience, narcotic traffickers will often have "traps" located in areas of a vehicle to avoid law enforcement detection. A "trap" is a term that describes a hidden area or compartment to place narcotics and/or currency to conceal said illegal items from being located. Based on their training, experience, and familiarity with this investigation, case agents believe that ISA is using the engine block of his vehicle as a trap.

21. On Tuesday, October 17, 2023, case agents monitored electronic surveillance at Bar 1000. At approximately 2:46 p.m., BEA arrived in a silver Jaguar XJ8 with WI registration AUW-1498. BEA parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:45 p.m. a subject wearing a white coat walked to the rear of the bar from the front. This subject was later identified as Hammad ISA. ISA was observed placing a cell phone up to his ear. Case agents reviewed pen register data for BEA's confirmed secondary phone number of 414-552-2844. According to the pen register data, BEA received a phone call from ISA at 3:45 p.m. One minute after ISA called Timothy BEA, BEA exited the rear of the bar

9

and subsequently went back into the bar with ISA following behind. When ISA walked into the bar he was carrying a white bag in his left hand. Once ISA and BEA entered the back area of the bar, they closed the gate behind them. At approximately 3:49 p.m., BEA and an unknown male black subject exited the rear of the bar. BEA was carrying a blue and tan colored bag, and the second unidentified subject was carrying a white box. Both subjects walked out of view of case agents. Shortly thereafter, BEA returned to the bar still carrying the blue and tan bag, while the unknown male black returned to the bar no longer carrying the box. At approximately 3:58 p.m., ISA and BEA exited the back of Bar 1000. ISA was observed carrying a brown box in both of his hands (similar to the box he was observed previously carrying on September 19, 2023, as described above). ISA walked around the north side of the bar, toward the front, and exited the view of case agents. At approximately 4:37 p.m., BEA exited the bar, entered into the silver Jaguar, and left.

22. On Wednesday, October 25, 2023, case agents reviewed electronic surveillance at Bar 1000. At approximately 3:21 p.m., BEA arrived in the silver Jaguar, parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:41 p.m., Hammad ISA was observed walking back and forth near the gate of Bar 1000 with his cell phone in hand for two minutes. At 3:43 p.m., BEA opened the back gate to Bar 1000 and let ISA in. At approximately 3:47 p.m., ISA was observed exiting the back gate of the bar and walking southbound in the alleyway, out of view of case agents. BEA was observed exiting the back gate of Bar 1000 approximately one minute later carrying a black garbage bag that appeared half full. BEA walked southbound through the alleyway in the same direction of ISA. At 3:50 p.m., BEA was observed returning to the back gate of the bar with nothing in his hands. ISA then returned to the bar with nothing in his hands at approximately 4:03 p.m. At approximately 4:06 p.m., ISA's

10

gray Lexus that case agents had seen on previous days left northbound through the alley behind Bar 1000.

23.     On Monday, October 30, 2023, case agents reviewed electronic surveillance from Friday, October 27, 2023 at Bar 1000. At approximately 5:57 p.m., BEA arrived in the silver Jaguar XJ8 (AUW-1498), parked in the back of the bar, exited the vehicle, and subsequently entered into the back gate of Bar 1000. At approximately 6:09 p.m., Hammad ISA's gray Lexus bearing IL registration Q198950 parked behind Bar 1000. ISA parked his vehicle with the front of the vehicle positioned near the back gate of Bar 1000. ISA exited the driver seat of the vehicle and approached the back gate of Bar 1000. BEA opened the gate for ISA and let him into the bar.

24.     At approximately 6:11 p.m., Johnnie HAYNES (DOB: xx/xx/1970) arrived in his Maroon Dodge Ram pickup truck bearing Wisconsin registration TY6749 and parked in the rear of Bar 1000. Through investigation, HAYNES has been identified as an associate to Myron and BEA. HAYNES exited his vehicle and walked into the back of the bar. Shortly afterwards, ISA exited the bar and approached the back of the Lexus. ISA opened the trunk of the Lexus and reached in. ISA closed the trunk and approached the front passenger door of the Lexus. ISA opened the front passenger door, reached in, and then closed the door. ISA walked around to the driver door, reached in and proceeded to walk to the front of the Lexus. ISA stood between the hood of his vehicle and the back gate of Bar 1000, looking around the area in a suspicious manner. As ISA stood near the gate of the bar and scanned the area, the back gate of the bar opened. ISA stepped close to the back gate of the bar and was handed a black bag by someone wearing a black sweatshirt similar to the one BEA was wearing when he entered the bar. With the bag in hand, ISA quickly turned around and opened the hood of his vehicle. ISA was observed retrieving approximately five rectangular-shaped items wrapped in a shiny film and placed them into the black bag. These items were consistent in shape and size with that of a kilogram of narcotics.

11

After filling the bag, ISA closed the hood of the car and quickly entered the back gate of Bar 1000. At almost the same time ISA entered the back gate with the black bag, HAYNES exited the back gate of the bar and left in his pickup truck.

25.     At approximately 6:14 p.m., BEA exited the back gate of the bar with a black bag in his hand and approached the area where his vehicle was parked. BEA parked his vehicle in an area that was partially blocked from case agents' view. BEA returned from the area of his vehicle and went back into the bar with nothing in his hands. At approximately 6:20 p.m., a gold Cadillac SUV bearing Wisconsin registration ABU-1610 pulled into the alleyway behind Bar 1000 and parked. Case agents have observed BEA operating this same vehicle in the past. BEA exited the bar, walked in the direction of his Jaguar, which case agents could not observe. Shortly afterwards, BEA walked from the area of his Jaguar to the gold Cadillac SUV. BEA briefly met with the operator of the vehicle before returning to the bar. The gold Cadillac left immediately after meeting with BEA. At approximately 6:32 p.m., BEA exited the bar again and again met with the operator of the gold Cadillac, which returned to the bar. After a quick exchange between BEA and the driver of the gold Cadillac, BEA went back into the bar again. At approximately 6:40 p.m., ISA exited the bar and again opened the hood of his vehicle. ISA was observed either removing something from under the hood, or placing something in the engine block area, before closing it and getting into his vehicle. ISA left the area immediately after getting into his vehicle.

26.     As stated previously, placing items in trap areas, like an engine block underneath the hood of a vehicle, is consistent with hiding illegal substances or drug proceeds. Additionally, based on their training and experience, case agents know that drug traffickers often scan the area around them when engaging in illegal activity in counter-surveillance efforts, or to detect the presence of any onlookers, including law enforcement officers and rival drug traffickers. Against the backdrop of BEA and Hammad ISA's known narcotics distribution activities, their counter-

12

surveillance described above and the transfer of items located in the engine block of a vehicle is activity that is consistent with narcotics distribution.

27.    On November 1, 2023, case agents monitored electronic surveillance at Bar 1000. At approximately 6:26 p.m., BEA met with an unknown individual at Bar 1000. The unknown subject approached the back of Bar 1000 on foot and was let in the back gate by BEA. At approximately 6:29 p.m., BEA and the unknown subject exited the back gate of the bar. The unknown subject waited by the gate while BEA approached the driver door of his known silver Jaguar. BEA opened the door of the Jaguar, reached in, and appeared to pull the hood release lever. BEA closed the door and walked to the hood of the silver Jaguar where the unknown subject was standing. BEA lifted the hood of the vehicle and retrieved an unknown item from under the hood. As BEA closed the hood of the vehicle, he handed the object that he had retrieved to the unknown individual. The unknown individual left the area on foot, and BEA returned to Bar 1000. Based on case agents' training and experience, the belief that BEA is distributing narcotics at Bar 1000, the short duration of the meeting between BEA and the unknown subject, and BEA's use of the hood area of his vehicle, case agents believe that BEA's activities were consistent with a drug transaction.

28.    On November 3, 2023, the Honorable William E. Duffin, U.S. Magistrate Judge, Eastern District of Wisconsin, signed and authorized a E-911/GPS ping warrant for ISA's known cell phone number, 708-986-7822. *See* 23 MJ 176. Since this time, multiple extensions of this warrant have been authorized.

29.    The court-authorized location data for ISA's phone number reflected that ISA's phone traveled to the Milwaukee area on November 10, November 15, November 22, November 30, and December 11, 2023. On each occasion, ISA's phone remained in Milwaukee, near the

area of Bar 1000, for only a short duration of time before returning to the area of Burbank, Illinois where he resides. The total trip duration for each trip was approximately three hours or less.

30. On the dates that ISA's phone was located in Milwaukee, case agents reviewed electronic surveillance or conducted physical surveillance at Bar 1000 and observed Hammad ISA at Bar 1000 on three occasions and Foad ISA at the bar on two occasions, as detailed below.

a. On November 9 and 22, 2023, ISA was not observed on electronic surveillance at Bar 1000. However, on November 9, 2023, white en route to Milwaukee, ISA called BEA's secondary phone (414-552-2844). Approximately 3 minutes after calling BEA, ISA received a call from his father, Foad ISA (312-375-5886). Nine minutes later, ISA called BEA. ISA then called Foad ISA once again a few minutes later. The location data for ISA's phone reflected that it was in the area of Bar 1000 for approximately fifteen minutes on November 9, and that it was in Milwaukee for approximately 45 minutes on November 22, 2023.

b. On November 15, 2023, at approximately 5:08 p.m., case agents observed via electronic surveillance what appeared to be a black Ford Edge pull into the back parking stall of Bar 1000. Individuals believed to be Foad ISA and Hammad ISA exited the Ford Edge and entered Bar 1000. Hammad ISA then exited the bar, walked to the front driver's side of the Ford Edge, appeared to grab something, and re-entered Bar 1000. At approximately 5:22 p.m., Foad and Hammad ISA exited Bar 1000 and departed the area in the Ford Edge. Furthermore, case agents observed BEA arrived to Bar 1000 at approximately 1:00 p.m. on this day and remain at the bar long after the ISAs left. Based on the location data for ISA's phone, ISA's phone was in Milwaukee for approximately 45 minutes on this day.

c. On November 30, 2023, case agents observed via electronic surveillance a black Cadillac Escalade bearing WI registration 244-ZNC pull up in the back of Bar 1000. As previously mentioned, this Cadillac is registered to BEA. Following directly behind the Cadillac Escalade was a black Ford Edge bearing IL registration EA93867 (suspected to be Foad ISA's vehicle). Hammad ISA and an individual believed to be Foad ISA exited the black Ford Edge. At approximately 5:00 p.m., Foad ISA opened the driver door of the Escalade and appeared to briefly manipulate something within the vehicle while Hammad ISA opened the front passenger door. Both subjects closed the doors to the Escalade, appeared to talk with an individual within the gated area, and subsequently walked through the side walkway of the bar, which is located between Bar 1000 and an apartment complex located at 3947 N. Teutonia, which apartment is associated with BEA and other identified DTO members. It was unclear if either Foad or Hammad ISA were carrying anything. Shortly thereafter, BEA arrived in the back of the bar in his known silver Jaguar XJ8

14

bearing WI plate AUW-1498 and entered the bar through the back gate. At approximately 5:31 p.m., an unknown subject exited the back gate of Bar 1000 and entered the 3947 N. Teutonia Avenue apartment complex for approximately one minute before returning to Bar 1000. At approximately 5:35 p.m., Hammad and Foad ISA exited the back gate of Bar 1000 and left in the black Ford Edge.

d. On December 11, 2023, at approximately 2:55 p.m., case agents conducted physical surveillance and observed ISA's known silver Lexus bearing IL plate Q198950 and BEA's silver Jaguar parked in the back of Bar 1000. At approximately 3:09 p.m., after being at Bar 1000 for approximately 16 minutes, agents observed ISA walk to his Lexus and leave the bar.

31.     Based on their training, experience, and familiarity with this investigation, case agents believe that ISA's shorter duration trips to meet with BEA at Bar 1000 are consistent with narcotics-related activities. Furthermore, case agents believe that after the ISA's trips to Milwaukee, that BEA distributes narcotics to the TARGET SUBJECTS in the Metro-Milwaukee area.

**b.  BEA's April 2025 arrest and the recovery of fentanyl and firearms**

**i.       Seizure of Suspected Fentanyl on April 17, 2025**

41.     During the evening hours of April 17, 2025, case agents observed that the location data for one FOAD's telephone number began traveling north towards Wisconsin. Shortly thereafter, location information for BEA's telephone reflected it left BEA's West Allis residence and began traveling south, leading case agents to believe the two would imminently be meeting. According to electronic surveillance, case agents knew that BEA was driving his black Cadillac Escalade. FOAD's phone subsequently began to reflect it was in the area of Pleasant Prairie, Wisconsin, nearing the outlet mall. Case agents then stopped receiving location data for BEA's phone. However, as officers were traveling south, they observed BEA's Cadillac Escalade traveling back north. Officers then began surveilling BEA.

15

42.     Subsequently, law enforcement officers conducted a traffic stop of the Cadillac Escalade. A drug detection dog was on the scene of the traffic stop, and when it circled the Cadillac Escalade, the drug detection dog alerted to the presence of controlled substances in/on the Cadillac Escalade. Subsequently, officers conducted an on-scene search of the Cadillac Escalade and located a brick-shaped object under the hood. The suspected controlled substance was field tested, which test returned positive for the presence of fentanyl, a Schedule II controlled substance.

ii.     **Seizure of Suspected Fentanyl, Cocaine, and 13 firearms (including a machinegun) on April 18, 2025**

43.     On April 18, 2025, the Honorable Stephen C. Dries, United States Magistrate Judge for the Eastern District of Wisconsin, authorized search warrants for BEA's residence, located at 2636 S. 76th Street, West Allis, Wisconsin, and ICare Childcare/Bar 1000, located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin.

44.     A search of I-Care Childcare/Bar 1000 resulted in the recovery of the following: approximately 5,375 grams (5 kilograms) of suspected fentanyl, approximately 1,055 grams (approximately 1 kilogram) of suspected cocaine. All narcotics were field tested and indicated positive results for their respective controlled substance. All narcotics were weighed while in the respective packaging. The suspected cocaine has now been tested by the crime laboratory and approximately 41 grams has been confirmed to be cocaine base. Additionally, case agents located 3 firearms including a shotgun and 2 pistols, one with a switch, which converts the firearm from semi-automatic to fully-automatic inside 3941 N. Teutonia Avenue. Law enforcement officers also located an envelope addressed to BEA at the address of ICare Childcare/Bar 1000.

45.     A search of BEA's West Allis residence resulted in the recovery of the following: two different kilogram presses, a money counter, 10 firearms, including 5 pistols and 5 rifles, and ammunition. Numerous firearms were located in a bedroom identified by his mother as belonging

16

to BEA, and an additional firearm was located in a vehicle believed to be used by BEA. Furthermore, located within the residence were multiple documents for "Bar 1000"/3941 N. Teutonia Avenue, and mail addressed to BEA at the address for ICare Childcare/Bar 1000.

### c. Court-Authorized TIII Interceptions of DTO Wire and Electronic Communications

46.     In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

a. On October 16, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (630) 363-1087, used by Timothy **BEA**, and from 708-986-7822, used by **HAMMAD**. Interceptions over (630) 363-1087 terminated at 11:59 p.m. on November 14, 2024. Interceptions over 708-986-7822 were extended for an additional 30 days as detailed below.

b. On November 14, 2024, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from 708-986-7822, used by **HAMMAD**. Judge Stadtmueller also ordered the initial interception of wire and electronic communications to and from 414-206-8589, used by Timothy **BEA**, the initial interception of wire communications to and from 312-375-5886, used by **FOAD**, and the initial interception of wire communications to and from 312-841-4635, used by **FOAD**. Interceptions over 708-986-7822, 414-206-8589, 312-375-5886, and 312-841-4635 were scheduled to terminate at 11:59 p.m. on December 13, 2024, but were extended for an additional 30 days as detailed below.

c. On December 13, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from 708-986-7822, used by **HAMMAD**, the continued interception of wire and electronic communications to and from 414-206-8589, used by Timothy **BEA**, and the continued interception of wire communications to and from 312-375-5886 and 312-841-4635, used by **FOAD**. Judge Pepper also ordered the initial interception of wire communications to and from 312-312-8875 TARGET TELEPHONE 6, used by Larry MONEYHAM. Interceptions over 708-986-7822, 414-206-8589, 312-375-5886, 312-841-4635, and 312-312-8875 were scheduled to terminate at 11:59 p.m. on January 11, 2025, but were extended for an additional 30 days as detailed below.

d. On January 10, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from 708-986-7822, used by **HAMMAD**, the continued interception of wire communications to and from 414-

206-8589, used by Timothy **BEA**, the continued interception of wire communications to and from 312-375-5886 and 312-841-4635, used by **FOAD** and the continued interception of wire communications to and from 312-312-8875, used by Larry MONEYHAM. Interceptions over 708-986-7822 and 312-312-8875 were terminated at 11:59 p.m. on February 8, 2025. Interceptions over 414-206-8589, 312-375-5886, and 312-841-4635 were extended for an additional 30 days as detailed below.

e.  On January 23, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the renewal of interceptions of electronic communications to and from 414-206-8589, used by Timothy **BEA**. Electronic interceptions over 414-206-8589 were scheduled to terminate at 11:59 p.m. on February 21, 2025.

f.  On February 7, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin entered an order allowing for the continued interception of wire and electronic communications, to and from 414-206-8589, used by Timothy **BEA**, and the continued interception of wire communications to and from 312-375-5886 and 312-841-4635, used by **FOAD**. Interceptions over 414-206-8589, 312-375-5886, and 312-841-4635 were terminated at 11:59 p.m. on March 8, 2025.

47.     Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public records searches, and electronic and personal surveillance. The intercepted calls detailed below are provided solely as a sample of what case agents believe are numerous inculpatory interceptions with the identified below targets. Furthermore, the significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge thus far derived from this investigation.

48.     As stated previously within this criminal complaint, case agents began establishing BEA's local narcotic distribution network prior to the Title III applications. However, due to multiple factors such as BEA's operation of a bar/tavern where he had the ability to meet with

18

customers in person along with the challenge of differentiating narcotic customers verses bar patrons, understanding the full-scope of BEA's distribution network was not fully realized until the interception of BEA's communications. Through interception, case agents were able to confirm their prior beliefs that the TARGET SUBJECTS, such as Frank **AYALA**, William **THOMAS**, Freddie **ROBERTSON**, and Alonzo **KIMBLE** were indeed narcotic customers. Furthermore, through interception, case agents identified additional customers such as Claudell **SIMS**, Dennis **BROWN**, Antonio **GREEN**, and Ngadah **KAMANDA.** Contextually through an intercepted communication between **BEA** and **SIMS** (paired with surveillance), case agents identified Alfonzo **TREADWELL** as another drug customer**.** Through interceptions, case agents established a more defined narcotics network involving the TARGET SUBJECTS, ultimately suppled and led locally by BEA**.**

49.     Below are examples of relevant interceptions between BEA and each of the TARGET SUBJECTS (other than **TREADWELL**) establishing their involvement in the DTO and their use of their respective TARGET TELEPHONE in furtherance of drug trafficking. **TREADWELL's** involvement in the DTO and his use of his specific TARGET TELEPHONE is also established below.

**TARGET TELEPHONE A – Claudell SIMS**

50.     On October 27, 2024, case agents intercepted an outgoing call from BEA to Claudell SIMS (TT-A) pursuant to the authorized Title-III interceptions over BEA's telephone line. During the course of this call, BEA and SIMS discussed organizing a suspected narcotics transaction at 3941 N. Teutonia Avenue (Bar 1000). Case agents conducted physical and electronic surveillance at 3941 N. Teutonia Avenue (Bar 1000). At approximately 3:06 p.m., BEA arrived at 3941 N. Teutonia Avenue. At approximately 3:09 p.m., electronic surveillance showed a subject, later identified as SIMS, enter into the rear of 3941 N. Teutonia Avenue with BEA.

19

Approximately seven minutes later, at 3:16 p.m., BEA and SIMS exited the back gate of Bar 1000. BEA and SIMS both got into BEA's Cadillac Escalade and left the area. At approximately 3:38 p.m., BEA and SIMS returned to 3941 N. Teutonia Avenue. From 3:38 p.m. to approximately 5:29 p.m., BEA and SIMS remained at Bar 1000 and conducted suspected narcotics transactions with at least two unidentified subjects.

51.     Based on the intercepted phone calls between BEA and SIMS, and surveillance operations, case agents suspect SIMS is a narcotics customer of BEA.

52.     On February 19, 2025, case agents intercepted an outgoing call from BEA to Claudell SIMS (TT-A) pursuant to the authorized Title-III interceptions over BEA's telephone line. During the course of this call, SIMS reported that things are "slow as fuck" and BEA responded that BEA is waiting and talked to "him" the prior day and things it might be today. BEA asks SIMS to bear with BEA for a little longer. In context, based on my training and experience, I believe that BEA is waiting on a resupply of drugs from his source of supply ("him") and BEA is keeping SIMS updated as to the timing of when BEA can provide drugs to SIMS.

53.     BEA and SIMS continued to have contact over TT-A after TIII interceptions ended in March 2025. Specifically, between March 8, 2025, and April 20, 2025, three days after BEA's arrest, there have been a total of 38 connected and/or attempted contacts between Claudell SIMS (TT-A) and Timothy BEA. Based on my training and experience, I believed that BEA would soon be in contact with his supplier to acquire additional drugs and was coordinating with SIMS in order to source SIMS with drugs in the near future. As detailed above, on April 17, 2025, BEA was traffic stopped in possession of a kilogram of suspected fentanyl. I believe that BEA had acquired that kilogram from FOAD in the Kenosha area and was heading back to Milwaukee. Additional kilograms of fentanyl were later recovered at Bar 1000. In the week leading up to

BEA's traffic stop, pen register/trap and trace data showed that BEA continued to communicate with TT-A.

54.     In October 2024, January 2025, and May 2025, case agents submitted an administrative subpoena to T-Mobile for TARGET TELEPHONE A. Each of these results reflected that the subscriber for TT-A was Claudell SIMS, with an address of 2956 N. 50th Street. On May 15, 2025, case agents conducted a search of TARGET TELEPHONE A in CashApp. This phone number is associated to an account with the username "Claudell Sims" and the handle "$ClaudellSims". Therefore, I believe that TT-A is currently used by SIMS.

**<u>TARGET TELEPHONE B – Freddie ROBERTSON</u>**

55.     On September 30, 2024, at approximately 3:43 p.m., electronic surveillance showed that Hammad ISA met with BEA at Bar 1000. After Hammad ISA left to return to Illinois, BEA placed outgoing calls to ROBERTSON on TT-B. Based on my training and experience, I believe that BEA had acquired narcotics from HAMMAD and was contacting ROBERTSON to alert ROBERTSON that BEA now had drugs on offer.  On October 26, 2024, at approximately 10:05 a.m. case agents intercepted phone calls between BEA and ROBERTSON on TT-B. ROBERTSON answered and BEA stated "What's happening man? Checking with you. You alright?" ROBERTSON replied "Yeah. Know I – you know I be—you know what, I be walking my thing down, man [Laughs]." BEA responded, "You walking all that down huh, man?" ROBERTSON stated "Yeah, I be working that thing down so… yeah, but you know, shit it's back. You know, I'm coming straight at you soon. Let you know". BEA responded "Okay, I got you." ROBERTSON stated "[U/I]. Yeah, I'm coming straight at you bro. On the real. I ain't fucking around." Both parties acknowledged and the phone call ended.

56.     Based on the context of this phone call case agents believe that ROBERTSON is a narcotics customer of BEA. Case agents additionally believe BEA was checking in with ROBERTSON to see if he needed any more narcotics, and ROBERTSON informed BEA that he was still selling from the inventory of narcotics he already had; however, when he was out, he would come straight to BEA.

57.     On November 20, 2024 case agents intercepted phone calls and text messages between BEA and TT-B. BEA texted ROBERTSON asking "Good?" ROBERTSON replied, "After Work" and "getting it together". At approximately 3:31 p.m., ROBERTSON, utilizing TT-B, called BEA. After greeting and deciding when to meet, BEA told ROBERTSON "Let me see what I got; let me see. I'll call you right back". Approximately eight minutes later, at 3:39 p.m., BEA called TT-B back and stated, "There's only fire right now". ROBERTSON went on to ask, "Oh, uh, uh, uh what you want for that?" BEA replied "Uh, give me uh.. give me twenty-eight. Give me twenty-eight". ROBERTSON agreed, and the call ended.

58.     At approximately 4:09 p.m. ROBERTSON, using TT-B, called BEA. Simultaneously, electronic surveillance showed a blue 2022 Honda Accord bearing Wisconsin registration AXW-7184 arrive and park in the rear of 3941 N. Teutonia Avenue. The registration on this vehicle lists to ROBERTSON. Approximately one minute after his arrival, BEA exited the back gate of Bar 1000, and entered the passenger seat of ROBINSON's vehicle. BEA was in ROBINSON's vehicle for approximately 20 seconds before he exited, and returned to the back gate of Bar 1000. ROBERTSON's vehicle then backed out of the parking stall and left the area. Based on the conversations between BEA and ROBERTSON, and the short meeting, case agents believe that BEA supplied ROBERTSON with narcotics.

59.     As detailed above, on April 17, 2025, case agents were monitoring the E-911/GPS ping and pen data for BEA and Foad ISA. Based on this information case agents believe the two

22

subjects met to conduct a narcotics transaction in the area of Pleasant Prairie, Wisconsin. After the suspected narcotics transaction was completed, and while BEA was returning to the Milwaukee area, he placed an outgoing calls to TT-B, TT-D, and TT-H. While traveling back to Milwaukee, a traffic stop was conducted on the vehicle BEA was operating. Ultimately, law enforcement located a kilogram of suspected fentanyl located in the engine compartment of the vehicle BEA was operating. Case agents believe that BEA was placing outgoing calls to TT-B, TT-D, and TT-H to inform them he had obtained narcotics for sale.

60.     During this investigation, case agents reviewed Milwaukee Police Department reports which reflect that, on September 2, 2024, Freddie ROBERTSON reported TARGET TELEPHONE B as his phone number in a contact with the Milwaukee Police Department. In May 2025, case agents submitted an administrative subpoena to AT&T for TARGET TELEPHONE B. The results reflected there is no listed subscriber for this telephone number. On May 15, 2025, case agents conducted a search of TARGET TELEPHONE B in CashApp. This phone number is associated to an account with the username "Freddie Robertson" and the handle "$frobertson50". Therefore, I believe that TT-B is currently used by ROBERTSON.

**TARGET TELEPHONE C – William THOMAS**

61.     On October 22, 2024, at approximately 10:20 a.m., BEA called THOMAS using TT-C. After answering the phone, BEA stated "Uh, I was just checking with you, man." THOMAS replied "Oh, yeah shit I was gonna give you a call. I was gonna call you yesterday but, shit I gotta… you know? Oo a couple more thing and I'll be right at you. My brother said he hollered at you." BEA stated "Oh, yeah, I run into his ass." THOMAS replied "Yeah, He had told me and shit. Yeah, I told him, I'll be getting up with him in a little bit though." BEA told THOMAS "Oh okay, just let me know, boy. [U/I] on the side I was trying to save it for you god damn" THOMAS replied "Okay, I got you, don't even trip." The two continued speaking and

23

THOMAS stated "And that, that right there…. Man, they killing that." BEA replied "Yeah, yeah, that's why I say this one. This order seem like it's a little better." THOMAS replied "Oh sir [Laughed] ," and BEA stated "Hell yeah. I always trying to get you [U/I] to this motherfucker." THOMAS replied "Right, well don't even trip, I'm on it though."

62.     Case agents believe that during the call between BEA and THOMAS: BEA was checking in with THOMAS to see if THOMAS wanted more narcotics. BEA told THOMAS that BEA was keeping some on the side for THOMAS. THOMAS told BEA that this specific batch of narcotics was really good in which BEA agreed. Based on the timing of this call (October 22, 2024), which was a few days after Hammad ISA likely brought a new batch of narcotics, case agents believe that BEA sold a portion of those narcotics to THOMAS.

63.     On February 24, 2025, BEA called THOMAS using TT-C. BEA advised THOMAS that "My people got it, though" and that BEA just has to "…orchestrate, um, getting it to me right now." BEA and THOMAS discussed price and BEA advised that they were at "…like 17 or something…" and "…something like that for the whole one…" BEA told THOMAS that if THOMAS "…trynna go half way, I'll put that order in and you know, they probably be a couple hours or something…" BEA then discusses that the border is closed and things will get tight and that, in context, customers will be "begging for you". THOMAS confirms that he is ready.

64.     Case agents believe that during the call between BEA and THOMAS: BEA is letting THOMAS know that the price for one kilogram is $17,000 but that THOMAS can order a ½ kilogram. BEA is also telling THOMAS that with increased border security on the US/Mexico border, the drug supply will dwindle, driving up demand by THOMAS's customers.

65.     In May 2025, case agents submitted an administrative subpoena to T-Mobile for TARGET TELEPHONE C. These results reflected that the subscriber for TT-C was William

24

THOMAS. On May 15, 2025, case agents conducted a search of TT-C in CashApp. This phone number is associated to an account with the username "William Thomas" and the handle "$Dane4814735". Therefore, I believe that TT-C is currently used by William THOMAS.

## TARGET TELEPHONE D – Antonio GREEN

66.     On December 28, 2024, case agents intercepted a phone call and text messages, between BEA and GREEN using TT-D. At approximately 4:50 p.m., GREEN sent a text message to BEA stating "wtw cuz, 10?" Shortly after sending this text, GREEN, using TT-D, called BEA and stated, "Shit, you said it still great on the other side right?" BEA replied "A ten [U/I]?" GREEN confirmed and BEA said "Ah, shit. I was trynna take out like a 10 piece or something". BEA replied, "A ten [U/I]?" GREEN confirmed and BEA stated "Oh, okay. I got you. Where you at right now?". GREEN and BEA continued to discuss a location to meet before BEA stated "Okay, I'm gon grab that shit in one lil' bit."

67.     Case agents believe that GREEN's message to BEA involved GREEN inquiring about a specific amount ("10") of an unknown narcotic. Case agents believe that BEA had that substance available, that GREEN ordered a "10" and they agreed to meet up later to conduct the drug transaction.

68.     As detailed above, on April 17, 2025, case agents were monitoring the E-911/GPS ping and pen data for BEA and Foad ISA. Based on this information case agents believe the two subjects met to conduct a narcotics transaction in the area of Pleasant Prairie, Wisconsin. After the suspected narcotics transaction was completed, and while BEA was returning to the Milwaukee area, he placed an outgoing calls to TT-B, TT-D, and TT-H. While traveling back to Milwaukee, a traffic stop was conducted on the vehicle BEA was operating. Ultimately, law enforcement located a kilogram of suspected fentanyl located in the engine compartment of the

25

vehicle BEA was operating. Case agents believe that BEA was placing outgoing calls to TT-B, TT-D, and TT-H to inform them he had obtained narcotics for sale.

69.     During this investigation, case agents reviewed Milwaukee Police Department reports which reflect that, on September 16, 2023, Milwaukee Police Officers responded to Froedtert Hospital for a subject with a self-inflicted gunshot wound. Upon officers' arrival, they met with GREEN, who had accidentally shot himself in the left leg. When questioning GREEN about where the firearm was, and where the incident occurred, GREEN provided his phone number as TARGET TELEPHONE D. In May 2025, case agents submitted an administrative subpoena to Verizon for TARGET TELEPHONE D. The results revealed there is no listed subscriber, however, it has been active since September 25, 2022. Furthermore, case agents conducted a search of TT-D in law enforcement databases, which showed Antonio GREEN as the user or to be in possession of TT-D. Therefore, I believe that TT-D is currently used by GREEN.

## TARGET TELEPHONE E – Ngadah KAMANDA

70.     Case agents know that KAMANDA is both a marijuana and cocaine/heroin customer of BEA. On December 29, 2024, at approximately 4:33 p.m., BEA called KAMANDA, who was using TT-E. After greeting, KAMANDA asked BEA "Yeah, you said it's uh, it's still fucked up on the other way?" BEA responded "Yeah, waiting like a motherfucker." After this brief discussion, KAMANDA and BEA went on to discuss marijuana and the prices associated. Based on KAMANDA asking BEA if it was "still fucked up on the other way?" and BEA responding that he was "waiting like a motherfucker" coupled with the fact that they went on to discuss marijuana afterwards, case agents suspect that KAMANDA was asking BEA if he was still out of cocaine/heroin, and BEA told him that he was still waiting on it to be delivered.

26

71. On February 2, 2025, at approximately 8:46 p.m., BEA called KAMANDA at TT-E. During the call, BEA stated, "Yeah, my bad, bro. I just got back around this motherfucker; you uh, you gotta work tomorrow?" KAMANDA stated, "Hell nah...." BEA stated, "Oh, well shit, I'll get you first thing; hit me when you get up." KAMANDA replied, "A'ight." BEA stated, "I got you." KAMANDA confirmed, "Yeah."

72. On February 3, 2025, at approximately 6:18 p.m., BEA called KAMANDA at TT-E. KAMANDA answered, "Yo." BEA stated, "I ain't hear from you this morning, man. I forgot." KAMANDA stated, "Oh, shit; I thought I called you, shit." BEA stated, "Hell nah, yeah; it's [U/I], man." KAMANDA stated, "Yeah, I did." BEA stated, "I was ready for you this morning, man; you still need anything?" KAMANDA asked, "Yes, yeah, yeah; you around?" BEA replied, "Hell yeah." KAMANDA stated, "A'ight, here I come." BEA asked "Where you at? Down the way?" KAMANDA stated, "Yeah, yeah." BEA stated, "Oh, okay; cool; I'll stop down right now; [U/I] you pulling up there right now." KAMANDA replied, "A'ight, here I come."

73. On February 3, 2025, at approximately 6:18 p.m., BEA called KAMANDA, at TT-E. KAMADA stated, "Yo." BEA asked, "Where you at right now, bro? KAMANDA stated, "Yeah, probably about five or six minutes away." BEA asked, "Hey, you can meet me at the uh, on East Capitol, at the, at the Office Depot right there." KAMANDA stated, "Uh... damn! Yeah, yeah; I can shoot down there." BEA replied, "Office Depot, across the street from Walmart." KAMANDA stated, "Yeah, yup; yeah, I know where is at. You said East Cap... uh, right there on the... off of like Port Washington or something." BEA replied, "Yeah, a little bit past Port Washington; it's like right across the street from Walmart, on Capitol. Right across the street." KAMANDA stated, "A'ight." BEA stated, "By the McDonald's there." KAMANDA "A'ight; here I come." BEA stated, "A'ight."

74.     I know based on previous intercepted phone calls between BEA and KAMANDA that KAMANDA is a drug customer of BEA's and that KAMANDA has previously received suspected marijuana from BEA. Additionally, based on previous calls between BEA and KAMANDA, I believe that KAMANDA is also a customer of BEA's for different types of narcotics such as cocaine and/or heroin. Based on the series of calls between BEA and KAMANDA, I believe that BEA provided KAMANDA with marijuana. Additionally, I know that BEA has previously been supplied with marijuana from the ISA DTO. Specifically, I believe that BEA and KAMANDA first discuss meeting up early the next day ("Oh, well shit, I'll get you first thing; hit me when you get up."). Based on my training and experience, and prior intercepted calls showing that KAMANDA is a drug customer of BEA's, I believe that this meeting was for KAMANDA to purchase drugs from BEA, likely marijuana. It is clear, however, that they did not meet early in the day on February 3, 2025 (BEA stated, "I ain't hear from you this morning, man. I forgot." KAMANDA stated, "Oh, shit; I thought I called you, shit."). I also believe that BEA had drugs on offer ("I was ready for you this morning, man; you still need anything?") and that they then made new plans to meet that evening for what I believe to be a drug deal ("Oh, okay; cool; I'll stop down right now; [U/I] you pulling up there right now." KAMANDA replied, "A'ight, here I come."). Ultimately, I believe the calls show that BEA and KAMANDA met at an Office Depot ("Office Depot, across the street from Walmart."). Based on my training and experience, I know that it is common for drug deals to occur in public parking lots and, based on the context of these calls, I believe BEA and KAMANDA were meeting in the area of Office Depot for BEA to supply KAMANDA with drugs, likely marijuana.

75.     On February 19, 2025, BEA called KAMANDA at TT-E. KAMANDA asked if BEA was "still smoking?" BEA advised that BEA "…I got a little something…" and "I got like, probably a cutie left, or shit, right now. I think I got a cutie to the side right now." KAMANDA

28

asked "…which one is it" and later advised that he was going to come to BEA's location ("…I'mma slide on you."). In context, case agents believe that KAMANDA was contacting BEA to acquire marijuana and that BEA had marijuana available for KAMANDA at BEA's location.

76.  During this investigation, case agents reviewed Hartford Police Department reports which reflect that, on September 11, 2024, KAMANDA was the operator of a vehicle during a traffic stop conducted near E. Sumner Street and Grand Avenue in the City of Hartford. During the course of this traffic stop, KAMANDA provided Hartford Police Officers the phone number of TARGET TELEPHONE E. In May 2025, case agents submitted an administrative subpoena to AT&T for TARGET TELEPHONE E. The results of this subpoena revealed the phone is active however there is no subscriber listed. On May 15, 2025, case agents conducted a search of TARGET TELEPHONE E in CashApp. This phone number is associated to an account with the username "Ngadah Kamanda" and the handle "$GettingtoitGanda". Therefore, I believe that TT-E is currently used by KAMANDA.

**TARGET TELEPHONE F – Alonzo KIMBLE**

77.  On August 5, 2024, at approximately 3:37 P.M., electronic surveillance showed Hammad ISA arrive in the rear of Bar 1000. During their meeting at Bar 1000, case agents observed Hammad ISA remove several rectangular shaped objects from the engine compartment of his vehicle and take them into Bar 1000. Based on these observations, case agents suspect Hammad ISA supplied BEA with several kilograms of cocaine or heroin.

78.  At approximately 5:36 p.m., BEA met with a gray/green Ford F-150 bearing Wisconsin registration SM5896 in the rear of Bar 1000. The registration on this vehicle lists to Jeanette PARSLEY (XX-XX-1970). Based on law enforcement databases, Jeanette PARSLEY is believed to be an associate of Alonzo KIMBLE. BEA provided the operator of the Ford F-150 a

multi-colored box that he carried from the bar. After the short meeting, and BEA provided the operator of the Ford F-150 with the box, the truck left the area and BEA returned to the bar. According to phone toll data, at 1:12 p.m. KIMBLE, using TT-F, called BEA. Based on this information, case agents suspect that KIMBLE was the operator of the Ford F-150 that BEA met with at Bar 1000.

79.     On November 16, 2024, case agents intercepted a phone call between BEA and TT-F. During the course of this phone call, BEA stated "Yeah, we good bro. Just gimme a lil' more time, god damn it, still working on it." KIMBLE responded "Bitch, I was gonna say man, how they looking? I've been [U/I]. I keep saying I'm gonna call, I'mma – I'mma call my man tomorrow, tomorrow, man I keep forgetting." BEA then stated "Yeah, yeah I'm working on it. God damn it, it's, yeah I'm working on it. You know I'm gonna have all that for you in one little minute, God damn it. I'll probably just.. give you ten (10) of the ten (10) when I get to ten (10), I'm almost there for though God damn it. I'm just…" KIMBLE replied, "Alright I appreciate it" BEA continued the conversation saying, "I'm just getting it together man, I got you." KIMBLE agreed and BEA continued stating "Hey but ain't, it ain't gon' never happen again. Ever since that day I've been opening these motherfuckers up boy." KIMBLE replied "Oh, okay." BEA stated again "Yeah, I got you though".

80.     Case agents believe, based on this conversation with KIMBLE, that BEA sold KIMBLE poor quality narcotics and to ensure it would never happen BEA stated "it ain't gon' never happen again" and "Ever since that day I've been opening these motherfuckers up boy". Case agents believe that BEA was referring to opening up kilograms to ensure they were good quality prior to selling them to his customers.

81.     On February 21, 2025, BEA sent a text message to TT-F that read "Haven't forgot about you playboy I need a little more time…this T". In context, I believe this message involved

BEA assuring his drug customer (KIMBLE) that BEA did not forget that KIMBLE needed narcotics, but that BEA needed more time to acquire them from BEA's supplier.

82.     During this investigation, case agents reviewed Mequon Police Department reports which reflect that, on May 7, 2023, the Mequon Police Department conducted a traffic stop of a vehicle. During this traffic stop, the operator fled on foot from the vehicle and ultimately escaped. On May 22, 2023, while conducting follow up on the investigation, Mequon Police Officers contacted TARGET TELEPHONE F and vernally identified KIMBLE as the subject who was utilizing TT-F. In May 2025, case agents submitted an administrative subpoena to U.S. Cellular for TARGET TELEPHONE F. The results of the subpoena revealed the subscriber listed to "Bridgett Gordon" however, it has been active since November 29, 2014. On May 15, 2025, case agents conducted a search of TARGET TELEPHONE F in CashApp. This phone number is associated to an account with the username "YoungKimble" and the handle "$youngkimble". Furthermore, case agents conducted a search of TT-F in law enforcement databases which revealed Alonzo KIMBLE as the user or possessor of TARGET TELEPHONE F. Therefore, I believe that TT-F is currently used by KIMBLE.

### TARGET TELEPHONE G – Dennis BROWN

83.     On December 15, 2024, at approximately 2:11 p.m., BEA placed an outgoing call to BROWN, who was using TT-G. During the call, BROWN told BEA that he was sick for five days and that he "just started moving around yesterday." BROWN stated, "Hell yeah; but, shit, I'm out grooving now, shit; I definitely got goddamn it be right with you, goddamn it, either tonight or in the morning, like a lick [U/I] or something, at least, shit." BEA replied "I got you, bro." BROWN asked "Hey, uh, man, let me know if that [U/I] these niggas [U/I]." BEA replied "Yeah?" BEA continued "I'm waiting; I talked to him the other day; I'm waiting though; I said

31

I'm gonna let you know as soon as I touch it." BROWN replied "Look, I ain't not even touch none of them others you did yet." BEA stated "No?" BROWN replied, "No, I've been laying on the couch nigga, shit." BEA stated "Yes, sir; you better get down though." BROWN replied "Hell yeah, when you get there? Hopefully, yeah; I'm cool now; hopefully later on goddamn it, I'll be hitting you.

84.     Case agents believe that during this call, BEA called BROWN to collect money owed to BEA for previously fronted narcotics. Case agents believe that BROWN explained to BEA that he was sick, and he just started "moving" which I believe means that BROWN has resumed selling the previously fronted drugs now that BROWN is no longer ill. Case agents believe that BEA told BROWN that he (BEA) was waiting on his cocaine supplier and that BEA would let BROWN know as soon as he (BEA) obtains more narcotics ("I'm waiting; I talked to him the other day…" and "I'm gonna let you know as soon as I touch it."). BROWN indicated that he has not "touched" the other ones from BEA yet, and case agents believe that BEA told BROWN to start selling the narcotics BROWN already has on hand so he can pay BEA the money he owed to him.

85.     On January 4, 2025, case agents intercepted a call from BEA to BROWN at TT-G. In the call, BROWN tells BEA that BROWN wanted to give BEA money the previous night. BROWN states he will give BEA "…2300 or something…" In context, case agents believe that BROWN is advising BEA that BROWN has money available to repay BEA for previously fronted narcotics.

86.     On February 8, 2025, case agents intercepted a call from BEA to BROWN at TT-G. In the call, BROWN assured BEA that BROWN "…ain't forget about you brother, that's why I was calling you for…" and that BROWN "…I give you a nickel within the next couple of days

bro…I ain't forget about you…"   In context, case agents believe that BROWN is advising BEA that BROWN has money available to repay BEA for previously fronted narcotics.

87.     During this investigation, case agents reviewed Oak Creek Police Department reports which reflect that, on September 9, 2020, the Oak Creek Police Department conducted a traffic stop of a vehicle which BROWN was operating in the 900 block of W. College Avenue. During the course of this traffic stop, BROWN provided officers with TARGET TELEPHONE G as his phone number. In May 2025, case agents submitted an administrative subpoena to U.S. Cellular for TARGET TELEPHONE G. The results of the subpoena revealed the subscriber was listed as "Latonya Morris." On May 15, 2025, case agents conducted a search of TARGET TELEPHONE G in CashApp. This phone number is associated to an account with the username "Dennis Brown" and the handle "$Dbrown0921". Therefore, I believe that TT-G is currently used by BROWN.

## TARGET TELEPHONE H – Alfonzo TREADWELL

88.     Case agents did not intercept any pertinent communications between BEA and TREADWELL after November 2024.  However, case agents know that TREADWELL is a suspected narcotics customer/associate of Claudell SIMS and Timothy BEA. On October 22, 2024, at approximately 12:34 p.m., case agents intercepted a phone call between SIMS (TT-A) and BEA. During the course of this intercepted call, which was already in progress, SIMS stated "No, by the building."  BEA responded "Oh, you over there?" BEA asked if SIMS was waiting on him. SIMS informed BEA he just pulled up and BEA responded "A'ight, you can knock on that back, back door back there. I just told my boy, his name Pumpkin. I told him you was about to come, gonna let him check it out." BEA followed up by saying "You ain't got nothing?" SIMS responded "no". BEA told SIMS "Well, you gotta wait then. Shit, I'll be through there [U/I]."

The conversation continued with BEA explaining which door to use, and telling SIMS that BEA was on his way to Bar 1000. At approximately 1:09 p.m., BEA arrived at Bar 1000, to meet with SIMS and TREADWELL. Electronic surveillance showed BEA meeting in the back of Bar 1000 with SIMS, TREADWELL, and a fourth unidentified subject (presumably "Pumpkin"). After speaking with "Pumpkin" for a short period of time BEA, SIMS, and TREADWELL entered the back gate of Bar 1000. At approximately 1:45 p.m., SIMS and TREADWELL exited the back gate of Bar 1000 and entered into a Mercury Grand Marquis that is registered to TREADWELL before leaving the area. Furthermore, case agents noted that on October 19, 2024, at approximately 10:56 a.m., BEA received an incoming call from TT-H. Based on the intercepted call, case agents believe that BEA, SIMS, and TREADWELL met up to conduct a money or narcotics transaction. __

89.    As detailed above, on April 17, 2025, case agents were monitoring the E-911/GPS ping and pen data for BEA and Foad ISA. Based on this information case agents believe the two subjects met to conduct a narcotics transaction in the area of Pleasant Prairie, Wisconsin. After the suspected narcotics transaction was completed, and while BEA was returning to the Milwaukee area, he placed an outgoing calls to TT-B, TT-D, and TT-H. While traveling back to Milwaukee, a traffic stop was conducted on the vehicle BEA was operating. Ultimately, law enforcement located a kilogram of suspected fentanyl located in the engine compartment of the vehicle BEA was operating. Case agents believe that BEA was placing outgoing calls to TT-B, TT-D, and TT-H to inform them he had obtained narcotics for sale.

90.    In May 2025, case agents submitted an administrative subpoena to T-Mobile for TARGET TELEPHONE H. These results reflected there was no subscriber listed for TT-H, however it has been active since January 23, 2020. On May 15, 2025, case agents conducted a search of TARGET TELEPHONE H in CashApp. This phone number is associated to an account

with the username "Alfonzo Treadwell" and the handle "$AlfonzoTreadwell". Case agents also conducted a search of TT-H in law enforcement databases. The results showed that Alfonzo TREADWELL was the user of possessor of TT-H. Therefore, I believe that TT-H is still being used by TREADWELL.

## TARGET TELEPHONE I – Frank AYALA-DEJESUS

91.     On Monday, October 23, 2023, at approximately 3:28 p.m., case agents observed BEA on electronic surveillance arriving at Bar 1000 and entering the bar. At approximately 4:36 p.m., BEA exited the bar, entered his vehicle, and left the area. Approximately one minute later, BEA is seen walking westbound in the alleyway between 3947 N. Teutonia Avenue and Bar 1000. BEA was observed utilizing keys to enter into 3947 Teutonia Avenue. At 4:40 p.m., BEA exited 3947 Teutonia Avenue carrying a large black garbage bag that appeared approximately half full and walked directly into the rear of Bar 1000. At approximately 5:11 p.m., a maroon 2008 Jeep Commander registered to **AYALA** arrive in the rear of Bar 1000 and backed up to the gate. **AYALA** exited the driver seat of the vehicle and knocked on the gate. A few minutes later the gate opened, and **AYALA** opened the rear hatch of his Jeep Commander. BEA handed **AYALA** the black garbage bag he was previously observed with. **AYALA** placed the bag into the back of the Jeep and closed the back hatch, prior to leaving the area. On October 24, 2023, case agents issued an administrative subpoena for TARGET TELEPHONE I. These records reflected that on October 23, 2023, **AYALA** placed an outgoing call to BEA from TT-I.

### July 22, 2024 – HAMMAD Milwaukee Trip (Prior to TIII Authorization)

92.     On Monday, July 22, 2024, at approximately 2:38 p.m., case agents observed that HAMMAD's E-911/GPS ping data indicated HAMMAD crossed into Wisconsin from the Illinois border. At approximately 2:50 p.m., case agents set up physical surveillance in order to observe

the back of Bar 1000. The following events were captured by both electronic surveillance and physical surveillance with photos being captured by case agents:

    a.   At approximately 3:12 p.m., case agents observed FOAD ISA's known vehicle (black Ford Edge) parking in the back of Bar 1000. In review of FOAD's E-911/GPS ping data, case agents observed that FOAD was still located in Illinois during this time, leading case agents to suspect HAMMAD as the driver of FOAD's vehicle.

    b.   At approximately 3:18 p.m., case agents observed BEA arrive to Bar 1000 in his known black Cadillac Escalade. After parking, BEA exited his vehicle and proceeded to unlock the back gate of Bar 1000 and enter the bar area. At approximately 3:21 p.m., BEA was observed placing a larger cardboard box right outside of the back gate of Bar 1000 and immediately going back inside of Bar 1000. A few seconds later, HAMMAD was observed walking up to the cardboard box and grabbing it with one hand. Based on how HAMMAD was holding onto the box, the box appeared to be empty.

    c.   HAMMAD approached the front area of the black Ford Edge, out of view of physical and electronic surveillance. Approximately a minute later, HAMMAD was again observed carrying the same cardboard box that now appeared to be containing contents. The cardboard box appeared to be heavy as HAMMAD was carrying the box from the bottom. HAMMAD proceeded to enter the bar area.

    d.   At approximately 3:33 p.m., a gold minivan Bearing WI registration ATE-7714 pulled in and parked in between the Ford Edge and the Cadillac Escalade, in the back of Bar 1000. Case agents know this vehicle to belong to Frank AYALA. Case agents observed **AYALA** as the driver and observed a passenger sitting in the front

36

passenger seat. At approximately 3:39 p.m., case agents observed an unknown male black wearing a white t-shirt walked through the side walkway, in between Bar 1000 and 3947 N. Teutonia to the back of Bar 1000. The unknown M/B was holding a blue backpack and approached the passenger side the gold Minivan. The unknown M/B and the occupants inside of the gold minivan had a quick exchange before the unknown M/B entered the back gate of Bar 1000 with the blue backpack in his hand. At approximately 3:40 p.m., **AYALA** got out of the driver seat of the vehicle and an unknown M/H, who appeared to be in his late 20's early 30's, exited the front passenger seat of the vehicle. The two walked over to the driver's side back seat, opened the door, and stood by the area for approximately 15 seconds. **AYALA** closed the door and both subjects proceeded to go inside of the Bar 1000 area.

e. At approximately 3:47 p.m., BEA was observed opening the back gate of Bar 1000 carrying a brown cardboard box that appeared to contain contents. BEA proceeded to place the box down directly behind Frankie **AYALA**'s minivan (appeared to be an attempt to hide the box) and walked back by the gate.

f. BEA remained at the gate for approximately 15 seconds looking around the alley area while still maintaining eyesight on the box he had set down. A black BMW SUV was observed traveling S/B through the alley and BEA immediately walked over to the brown cardboard box. The black BMW SUV continued to travel slightly past the bar and turned around, heading back Northbound through the alley way. The black BMW SUV pulled up directly in back of Bar 1000 (perpendicular to Frankie **AYALA**'s minivan and BEAs Cadillac Escalade) and BEA was immediately observed picking up the brown cardboard box, walking it over to the

black BMW SUV, opening the back passenger door of the black BMW SUV and placing the box inside the vehicle.

g. BEA remained at the vehicle for approximately a minute and a half. The black BMW SUV left the area and BEA was observed returning to the Bar 1000 area carrying a large brown paper bag that contained handles. BEA entered into the Bar 1000 area with the brown paper bag. Based on the previously listed circumstances, case agents believe the cardboard box that BEA placed into the black BMW SUV contained narcotics and the brown paper bag that BEA returned to the bar with contained currency.

h. At approximately 3:53 p.m., **AYALA** and the unknown M/H exited the back gate of Bar 1000 and proceeded to get inside of the gold minivan. **AYALA** and the unknown M/H left the area. At approximately 4:01 p.m., a black Chevy sedan pulled through the alleyway going Southbound and stopped in back of Bar 1000. The black Chevy sedan was followed by Frankie **AYALA**'s gold minivan. An older unknown M/B wearing a white t-shirt and a white hat walked from what appeared to be 3947 N. Teutonia and approached the black sedan. At approximately 4:03 the older M/B left the black sedan and the black sedan pulled away. **AYALA** and his passenger parked their vehicle next to BEA's Escalade. **AYALA** and his passenger exited the vehicle and began looking at the tire areas of the gold minivan. The two remained outside until approximately 4:07 p.m., before being let in the Bar 1000 area. After **AYALA** and the unknown M/H entered the bar area, BEA was observed peaking over the back fence appearing to look around the alley.

i. At approximately 4:10 p.m., a white Volkswagen pulled up and parked perpendicular to the BEA and **AYALA**'s vehicles behind Bar 1000. BEA was

38

observed exiting the back gate of Bar 1000 carrying another box. BEA proceeded to walk to the white Volkswagen, opened the back driver's side door, and placed the box inside the vehicle. BEA remained at the vehicle for approximately 30 seconds before returning to the Bar 1000 area. It could not be determined if BEA had anything in his hands as he returned to the Bar. The white Volkswagen left the area.

j.  At approximately 4:15 p.m., case agents terminated physical surveillance however, continued to monitor electronic surveillance. At approximately 4:31 p.m., Both BEA and HAMMAD exited the back gate of Bar 1000. Based on the camera angle, case agents were unable to determine if HAMMAD was carrying anything in his hands. Additionally, case agents were unable to observe HAMMAD's vehicle due to vegetation blocking the view. At approximately 4:33 p.m., HAMMAD could be observed standing in between BEA's Escalade and **AYALA**'s minivan as he continued walking in and out of electronic surveillance view.

k.  At approximately 4:36 p.m., case agents observed HAMMAD's vehicle backing out and leaving the area. Case agents monitored HAMMAD's E-911/GPS ping data. At approximately 5:40 p.m., HAMMAD pinged back across the Illinois border. At approximately 6:11 p.m., case agents observed a 1,411-meter ping that appeared to be off of the highway in Wheeling, IL.

93.     On December 15, 2024, at approximately 2:05 p.m., BEA placed an outgoing call to an apparent drug customer (herein "Pumpkin"). During this call, "Pumpkin" ordered a quantity of narcotics ("…I need me one for tomorrow") and BEA advised that BEA was not around but would have his "boy" supply it ("…I'm gonna give my boy…I ain't around; I'll slide on you…" and "I'mma hit my boy to see if he can drive right now." A short time later, BEA called

39

PUMPKIN to advise that BEA's boy is going to meet PUMPKIN and will supply PUMPKIN with the drugs ("…my boy is on top of it all, big fat Puerto Rican, motherfucker is gonna come through there." And "…I just told him to drop you off the whole, shit."). Based on my training and experience and observations of AYALA, I believe that BEA was describing AYALA to PUMPKIN as the person who would supply PUMPKIN with the drugs. At approximately 3:27 PM, BEA received an incoming text message from AYALA from TT-I reading "Ok done". Based on my training and experience, I believe that AYALA had met with PUMPKIN to deliver narcotics on BEA's behalf. This belief was later confirmed when BEA and PUMPKIN spoke again and confirmed that PUMPKIN now had the drugs. Specifically, in a call at approximately 4:00 PM, BEA called PUMPKIN and PUMPKIN confirmed that the deal had occurred ("…oh yeah, he came through…") and that the quality of the drugs were better than a prior quantity ("…this shit like it's better than it was…").

94.     On May 15, 2025, case agents conducted a search of TARGET TELEPHONE I in CashApp. This phone number is associated to an account with the username "Frank Ayala" and the handle "$Frankieay64". This CashApp account also has a photograph of Frank AYALA-DEJESUS attached to it. Therefore, I believe that TT-I is currently used by AYALA-DEJESUS.

## CONCLUSION

94.     Evidence obtained during this investigation leads case agents to believe that the **TARGET SUBJECTS** continue to operate the **TARGET TELEPHONES**. The location data associated with the **TARGET TELEPHONES** will continue to assist case agents in conducting targeted physical surveillance and further identify the locations and individuals associated with the **TARGET SUBJECTS'** drug trafficking activities.

95.     Case agents are requesting warrants authorizing the collection of data related to the **TARGET TELEPHONES** for 30 days to further investigate the **TARGET SUBJECTS'**

activities, and to identify locations to which they are traveling to further their drug distribution trafficking activities and establish the locations in which they store their narcotics.

96.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are storing and trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that the **TARGET SUBJECTS** are engaged in the trafficking and distribution of controlled substances and are using the **TARGET TELEPHONES** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **TARGET TELEPHONES** will continue to assist case agents in determining their criminal activities, to include meeting locations, co-conspirators, and customers.

97.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

41

98.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **TARGET TELEPHONES**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

99.     I further know that some service providers can collect timing advance or engineering data commonly referred to as per call measurement data (PCMD), RTT, True Call, Advance Timing, WebMap, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

100.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific

geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **TARGET TELEPHONES**, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on the Service Provider's network or with such other reference points as may be reasonably available.

101.    I know that AT&T Corporation can provide historical precision GPS location information, historical handset location data, and handset triangulation data, also known as Network Event Location System (NELOS) data. NELOS data may provide location data based upon the handset itself.

### Subscriber Information

102.    Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET**

43

**TELEPHONES** user or users and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

103.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

104.    I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachments B1, B2, B3, and/or B4 that is within its possession, custody, or control.

105.    I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachments B1, B2, B3, and/or B4 unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET TELEPHONES** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.    The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

106.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONES** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified

44

in Attachments B1, B2, B3, and B4, which are incorporated into the warrants, the proposed search warrants do not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is a reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

107.    Because the warrants will be served on each Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night. I therefore request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONES** outside of daytime hours.

# ATTACHMENT A-1

## Property to Be Searched

1.     Records and information associated with the cellular devices assigned call numbers **(414) 248-7180 (TARGET TELEPHONE B), (414) 467-4928 (TARGET TELEPHONE E), and (414) 350-0829 (TARGET TELEPHONE I),** (referred to herein and in Attachment B-1 as "the **TARGET TELEPHONES**"), that is in the custody or control of AT&T Corporation, a wireless telephone provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida. There is no listed subscriber for **TARGET TELEPHONE B**, and it is used by Freddie ROBERTSON. There is no listed subscriber for **TARGET TELEPHONE E**, and it is used by Ngadah KAMANDA. There is no listed subscriber for **TARGET TELEPHONE I**, and it is used by Frank AYALA DEJESUS.

2.     The **TARGET TELEPHONES (TARGET TELEPHONE B, TARGET TELEPHONE E, and TARGET TELEPHONE I)**.

# ATTACHMENT B-1

## Particular Things to be Seized

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1:

    a.    The following subscriber and historical information about the customers or subscribers associated with the TARGET TELEPHONES for the time period September 1, 2023, to the present:

        i.    Names (including subscriber names, usernames, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long-distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET TELEPHONES for the time period January 1, 2024, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the TARGET TELEPHONES for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET TELEPHONES will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the TARGET TELEPHONES.

c. Information about the location of the TARGET TELEPHONES for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, NELOS, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service

3

Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the TARGET TELEPHONES on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846, involving the TARGET SUBJECTS and others known and unknown during the period from September 1, 2023 – Present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT <u>TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Corporation, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T Corporation. The attached records consist of _____.

I further state that:

a.      All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T and they were made AT&T as a regular practice; and

b.      Such records were generated by AT&T Corporation's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T Corporation in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by AT&T Corporation and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                      Signature

5